Larry WILLIAMS et al.

v.

CITY OF NEW ORLEANS et al.

Civ. A. No. 73–629.

United States District Court,
E. D. Louisiana.

June 11, 1982.

O. Peter Sherwood, New York City, Ronald Wilson, New Orleans, La., for plaintiffs.

Ralph Dwyer, New Orleans, La., for Civil Service Com'n.

Gilbert Buras, New Orleans, La., for City of New Orleans.

Patrick Hugg, New Orleans, La., for Larry Lombas, et al.

Ronda Lustman, Lynne Wasserman, New Orleans, La., for Cindy Duke, et al.

Sidney Bach, New Orleans, La., for Martin Venezia, et al.

Dale C. Wilks, New Orleans, La., for Horace Perez, et al.

SEAR, District Judge.

Larry Williams and twelve other black New Orleans police officers and applicants brought this action in 1973, seeking redress for alleged employment discrimination by the City of New Orleans, the New Orleans Civil Service Commission (CSC) and various municipal and CSC officials. On behalf of a class of similarly situated persons, the plaintiffs asserted that the defendants had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981,[1] and the Thirteenth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983.[2] After a period of initial activity, and an interlocutory appeal, progress in the case stalled and it was dismissed for failure to prosecute on August 25, 1978. Upon application by the plaintiffs, it was reopened and eventually readied for trial on the merits. At my behest, during pretrial proceedings the parties pursued settlement discussions, which culminated in an agreement announced on October 13, 1981, the day the trial was scheduled to commence. Now before me is a joint motion of the parties seeking court approval of a proposed consent decree incorporat-

---

**1.** 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. This section derives primarily from § 1 of the Civil Rights Act of 1866, 14 Stat. 27. *Bobo v. ITT, Continental Baking Co.*, 662 F.2d 340, 341 n.1 (5th Cir. 1981).

**2.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

This section encompasses violations of constitutional and federal statutory law. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

ing this agreement as well as objections by class members and nonblack police officers who were granted leave to intervene to challenge the decree.

## I. *The Decree and its Opponents*

The 33-page proposed decree governs virtually every phase of an officer's employment by the New Orleans Police Department (NOPD). Its most significant provisions pertain to recruiting, hiring, training, and promotion standards and procedures.

*Recruitment.* Article II of the decree calls for an intensified effort by the defendants to recruit black officers. As part of this commitment, the defendants are obligated specifically to send black officers on recruiting missions to local schools and community gatherings; establish centers in black neighborhoods to receive applications; encourage incumbent black officers to recruit qualified blacks; assign black officers as troubleshooting "buddies" to guide "minority" [3] applicants through the application process; shorten the application process; and train recruiting personnel to be familiar with application and selection procedures.

*Hiring.* The decree requires that the defendants develop new entry level selection procedures, as described in Article IX. It further mandates that the City "adopt measures which, as far as is feasible, will assure that over the course of a calendar year the proportion of blacks who graduate from the police academy will at least meet the proportion of blacks who pass the written entry level examination for the position of Police Recruit . . . ."

*Police Recruit Training.* Article IV of the decree commits the City to "make all reasonable efforts" to assist all recruits and probationary officers in resolving difficulties. Among the measures implementing this pledge are good faith endeavors to assure the availability of black and white

tutors, establishment of regular office hours for police academy instructors, institution of a "buddy" system for black recruits similar to the arrangement established for applicants, and assignment of at least four black officers to instructor positions at the academy. Additionally, the City is to create an "Academy Review Panel" composed of experienced officers, half of whom must be black. Every decision to dismiss or "recycle" a recruit must be submitted to the review panel for its approval. To ensure its independence, the panel is to report directly to the Superintendent of Police. Finally, Article IV forbids the use of general intelligence tests at the academy, and bars officers who have been the subject of repeated complaints of citizen mistreatment from serving as police instructors.

*Subclassification of Officers.* The decree provides that the defendants may proceed with their plans to create subclassifications of police officers, designated Police Officer I, II, III and IV. However, it specifies the maximum length of service that may be required as a condition for eligibility for each class—two years for Police Officer II, four years for Police Officer III, and six years for Police Officer IV. Although the choice of individuals to occupy each class is left to the discretion of the City, in exercising that discretion the City must "adopt procedures which assure that the proportion of white officers who are selected for appointment to a given classification does not exceed the proportion of white officers who are eligible to be selected for that classification."

*Promotions.* Article VI requires that black officers be promoted to police supervisory positions—sergeant, lieutenant, captain and major—on an accelerated basis. It operates in two stages. First, the City agrees to create immediately 44 new supervisory positions, and to fill these positions

---

**3.** Although the plaintiffs are black and the decree generally refers expressly to blacks, on occasion the decree employs the term "minority." Where it appears in the decree, the term apparently refers only to blacks, not to other minority groups. This is the evident under-standing of the parties and intervenors, and is consistent with the purpose of the decree. For example, it would seem anomalous if the defendants were required to assign black "buddies" to Hispanic applicants, as a literal reading of the decree might suggest.

with blacks.[4] Thereafter, and until blacks constitute half of all ranks within the NOPD, vacancies in the supervisory ranks are to be filled by blacks and whites on a one to one ratio. However, a rank need not be filled on this basis whenever doing so would result in a greater proportion of blacks in that rank than in the rank of police officer.

Article VII of the decree calls for revision of the minimum qualifications to take a promotional examination for a supervisory rank. To be eligible for examination for sergeant a candidate must have three years experience as a police officer; for lieutenant five years experience as a police officer or sergeant; and for captain seven years experience in a police classification. Candidates for captain and lieutenant must also have appropriate training and one year of field unit experience as a lieutenant and sergeant, respectively. Successful completion of certified job related educational courses may be considered in lieu of one year of experience. Article VIII provides that officers promoted pursuant to the decree must complete the NOPD's customary probationary period, but specifies that any vacancy created by the failure of a black officer to complete the probationary period must be filled by a black officer.

*New Selection Procedures.* Article IX of the decree requires the CSC to develop, in consultation with a psychometrician designated by the plaintiffs, new selection procedures for hiring and promotion. It mandates that any item on a test given to police recruits with a "statistically significant adverse impact against blacks" be eliminated. In promotions, a written examination is to be used as a qualifying measure, and is to be as "content valid as feasible." If a written promotional examination results in "adverse racial impact against blacks," the decree requires that the examination be inves-

tigated for unfairness. If, under scrutiny, the tests are judged to be unfair, or "if it is otherwise appropriate, a separate frequency distribution may be calculated and applied for blacks and whites." The test results are to be used to qualify candidates for participation in an oral assessment center, the findings of which place candidates in two to five groups of descending scores.

*Miscellaneous.* The proposed decree reaffirms the defendants' present rule that applicants must be domiciled in Orleans Parish before hiring. Likewise, no officer is eligible for promotion unless domiciled in Orleans Parish, except in individual cases where the residency requirement was waived. The decree also prohibits layoffs in the supervisory ranks, commits the defendants to review certain claims for reinstatement, establishes a $300,000 backpay fund for distribution to the plaintiff class, awards costs and attorneys' fees to the plaintiffs, and imposes extensive reporting obligations on the defendants. The decree expires when blacks constitute half of all ranks within the NOPD.

Third parties first began to assert interests in this litigation several months before the settlement was announced. On January 19, 1981, a week after a stipulation by the parties that no vacancies in the ranks of lieutenant and sergeant would be filled from existing promotional registers, Martin Venezia and thirteen other white officers on the sergeant promotional register sought leave to intervene.[5] On October 13, 1981, the day the trial was scheduled to begin, Horace Perez and three other Hispanic-American officers, on behalf of all Hispanic-American officers on the NOPD, moved to be joined as parties under Rule 19 of the Federal Rules of Civil Procedure. A similar motion was filed on November 2, 1981 by Larry Lombas, a white officer, on behalf of approximately 600 officers objecting to the

---

4. In preparation for the creation of the new positions, existing vacancies in supervisory ranks are to be filled through the immediate promotion of 12 white officers from existing promotional registers.

5. After I denied the Venezia group's motion to intervene as a party defendant on May 6, 1981, they appealed to the United States Court of Appeals for the Fifth Circuit. On January 18, 1982, the court of appeals ordered them to seek the limited intervention I had granted the three other groups of interested parties.

proposed consent decree. Finally, a fourth motion for joinder or leave to intervene was filed by Cindy Duke and two other female NOPD officers, on behalf of all female officers, claiming that the proposed settlement would impair their employment interests.

Following a hearing on the motions by the Perez, Duke and Lombas groups and on a motion for stay by the Venezia group, I permitted all four groups to intervene for the limited purpose of challenging the lawfulness and fairness of the proposed consent decree. I also announced that any NOPD officer would be allowed to file written objections to the decree. Including the 623 officers in the Lombas group, over half the NOPD availed themselves of this opportunity.

Objecting white police officers generally charged that the decree would subject them to unlawful racial discrimination and that it would severely impair their career aspirations. The Venezia group contended that since the defendants continued to deny that they had discriminated against blacks, the decree lacked a factual basis. Some whites complained bitterly that the defendants had failed to represent their interests and had attempted to conceal the terms of the settlement from affected employees. Others expressed a belief that various provisions of the decree would hamper the NOPD's law enforcement efforts.

Hispanic officers voiced similar objections, arguing that the decree's racial distinctions are unlawful. They also contended that the decree's recruitment provisions are unnecessary, since blacks annually submit more than half the applications received by the NOPD.

Emphasizing their alleged underrepresentation on the NOPD, women officers complained that their position would deteriorate significantly if the decree were approved. White females in particular complained that under the decree's promotional quota, they would face stiffer competition from white males for fewer vacancies in supervisory positions. The women also asserted that oral assessment centers used in promotional decisions discriminate against women because of attitudes typically harbored by inadequately trained interviewers. The thesis of the Duke group's objections was that any decree without protective provisions for female officers is unfair and unsuitable for judicial approval.

Eighteen of the approximately 400 member plaintiff class also objected to the proposed decree. In general, the objecting class members argued that the decree's backpay and reinstatement provisions are inadequate, and that the section governing promotion fails to provide definite timetables for implementation.

I conducted a hearing on the fairness of the proposed decree on four days in March and April of 1982. Plaintiffs presented a summary of evidence that they would adduce at trial, and moved jointly with the defendants for approval of the decree. Intervenors offered testimony in support of their challenge to the decree's fairness. An economist, nominated by the parties and appointed as an expert witness by the court with their consent,[6] outlined the decree's probable impact on the police force. I also orally examined approximately a dozen NOPD members who had filed written objections to the decree and asked to testify. After the close of the final day of the hearing, I took the matter under submission to consider the evidence introduced at the hearing, the briefs submitted by the litigants, and the extensive record compiled in this action.

## II. Standard for Approval

In an ordinary lawsuit, a decision by litigants to settle or compromise their dispute does not require involvement of the court; the settlement is consummated and the case is simply dismissed. However, where the parties seek to endow their compromise with the binding force of a judgment through the entry of a consent decree with injunctive provisions, the court is obligated to ensure that judicial power is not misused. The court's role is analogous,

6. Fed.R.Evid. 706(a).

though not identical, to its function in scrutinizing class action settlements to ascertain that they are fair, adequate and reasonable. *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *see* Fed.R.Civ.P. 23(e). As Judge Rubin recently explained, a proposed consent decree requires still closer attention:

> Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should, therefore, examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence. This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of record, whether established by evidence, affidavit, or stipulation. If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed.

*United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (en banc) (Rubin, J.) (footnote omitted).[7] To win approval in litigation seeking to enforce a federal statute, a decree must be "consistent with the public objectives sought to be attained by Congress." *Id.* In Title VII suits, a decree also should be viewed in light of Congress' determination that voluntary compliance is a preferred means of eliminating employment discrimination. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974).

My inquiry thus focuses on three criteria for approval: (1) whether the proposed consent decree is a reasonable factual and legal determination based on the record; (2) whether it constitutes a fair and reasonable settlement with respect to the plaintiff class; and (3) whether its effect on third parties is neither unreasonable nor unlawful.[8]

### III. *Plaintiffs' Case*

Plaintiffs advance claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, the Civil Rights Act of 1866, 42 U.S.C. § 1981, and, through 42 U.S.C. § 1983, the Thirteenth[9] and Fourteenth Amendments. Sections 1981 and 1983 generally parallel the remedy for racial discrimination in employment provided by Title VII. *Rivera v. City of Wichita Falls*, 665 F.2d 531, 534 n.4 (5th Cir. 1982); *Whiting v. Jackson State University*, 616 F.2d 116, 121–22 (5th Cir. 1980). Proof of discriminatory intent, however, is an essen-

---

**7.** No opinion commanded a majority of the judges of the Fifth Circuit in *City of Miami.* The en banc court vacated a panel's affirmance of a district court's approval of a consent decree in an employment discrimination suit brought by the United States on behalf of black, Hispanic, and female employees of the city. A majority of the en banc court favored vacating and remanding the approval, at least in part. Judge Rubin, joined by three judges, advocated remanding the case for a determination whether the United States had a right to relief for discrimination in police promotions, and whether affirmative action was an appropriate remedy. Judge Gee, writing for a plurality, favored a broader remand. Judge Frank Johnson, together with six judges, dissented, favoring complete affirmance. Judge Tjoflat also dissented on jurisdictional grounds.

Although differing on its application to the facts, the opinions of Judges Rubin, Gee and Johnson agreed that the controlling test was whether the proposed decree was unlawful or unreasonable in its effect on third parties. *Id.* at 451 n.8 (Gee, J.); *id.* at 460 (Johnson, J.).

**8.** Some objecting officers argue that the decree would impair the City's attempts to combat crime. Even if I shared this assessment, I could not withhold approval of the decree simply because I believed that the defendants were guilty of bad judgment. The remedy for this sort of grievance is found in the local political process, not in federal court.

**9.** Whether a public employer guilty of racial discrimination in employment violates the Thirteenth, as well as the Fourteenth Amendment, is unclear. The Supreme Court has "left open the question whether § 1 of the Amendment by its terms did anything more than abolish slavery." *City of Memphis v. Greene*, 451 U.S. 100, 125–26, 101 S.Ct. 1584, 1599, 67 L.Ed.2d 769 (1981) (footnote omitted).

tial element of claims under § 1981 and the Fourteenth Amendment. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Vasquez v. McAllen Bag & Supply Co.*, 660 F.2d 686, 687 (5th Cir. 1981); *Castaneda v. Pickard*, 648 F.2d 989, 1000 (5th Cir. 1981); *Williams v. De-Kalb Co.*, 582 F.2d 2 (5th Cir. 1978). Such proof is also required under Title VII where a plaintiff claims that he has received unfavorable "disparate treatment" from an employer because of his race, color, religion, sex or national origin. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854–55 n.15, 52 L.Ed.2d 396 (1977) (hereinafter *Teamsters*); *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 816 (5th Cir. 1982); *Pouncy v. Prudential Insurance Co.*, 668 F.2d 795, 802 (5th Cir. 1982); *Johnson v. Uncle Ben's Inc.*, 657 F.2d 750, 753 (5th Cir. 1981). In class action pattern and practice employment discrimination suits alleging disparate treatment, plaintiffs bear the burden of establishing a prima facie case that the defendant's customary practice was to discriminate against a protected class. *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977); *Teamsters, supra*, 431 U.S. at 336, 97 S.Ct. at 1855; *Payne v. Travenol Laboratories, Inc., supra*, 673 F.2d at 817. In a proper case, this burden may be discharged solely by showing a long-standing and gross statistical disparity between the protected class' and the favored class' receipt of a job benefit. *Teamsters, supra*, 431 U.S. at 339 n.20; 97 S.Ct. at 1856–57 n.20; *Payne v. Travenol Laboratories, Inc., supra*, 673 F.2d at 817; *Wilkins v. University of Houston*, 654 F.2d 388, 395 (5th Cir. 1981). A less pronounced statistical disparity may also suffice to establish a prima facie case of disparate treatment if buttressed by other evidence, such as testimony revealing a history of discriminatory practices by an employer, individual instances of discrimination, and opportunities to discriminate inherent in the employer's decisionmaking processes. *Payne v. Travenol Laboratories, Inc., supra*, 673 F.2d at 817.[10]

■ Where plaintiffs allege a Title VII violation based on the "disparate impact" of a facially neutral employment practice upon a protected group, purposeful discrimination need not be demonstrated. *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971); *Pouncy v. Prudential Insurance Co., supra*, 668 F.2d at 799–800. To establish a prima facie case in these circumstances plaintiffs need only show that the challenged practice results in a significantly adverse statistical impact on their protected class. *Dothard v. Rawlinson, supra*, 433 U.S. at 329; 97 S.Ct. at 2726–27; *Pouncy v. Prudential Insurance Co., supra*, 668 F.2d at 800; *Rivera v. Wichita Falls, supra*, 665 F.2d at 534–35. Only particular employment practices may be challenged under the disparate impact approach. "The disparate impact model applies only when an employer has instituted a specific procedure, usually a selection criterion for employment, that can be shown to have a causal connection to a class based imbalance in the work force." *Pouncy v. Prudential Insurance Co., supra*, 668 F.2d at 800. Once a prima facie case has been shown, the burden shifts to the employer to demonstrate that the practice under attack is justified by a legitimate business purpose. The plaintiffs may then respond by showing other practices would accomplish the employer's objective without a disparate effect. *Dothard v. Rawlinson, supra*, 433 U.S. at 329, 97 S.Ct. at 2727.

An important limitation on Title VII's coverage is relevant here: the statute did not apply to public employers until March 24, 1972. The Supreme Court has ruled that a "public employer who from that date forward made all its employment decisions

---

10. The Fifth Circuit recently emphasized that the order of proof enunciated by the Supreme Court in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) is applicable only to individual disparate treatment cases, not to class claims. *Payne v. Travenol Laboratories, supra*, 673 F.2d at 818.

in a wholly nondiscriminatory way would not violate Title VII even if it had maintained an all-white work force by purposefully excluding Negroes." *Hazelwood School District v. United States, supra,* 433 U.S. at 309, 97 S.Ct. at 2742 (footnote omitted). For this reason, the Court has instructed that employers be afforded an opportunity to respond to a prima facie case established by statistical disparities by showing that such disparities are attributable to pre-Title VII hiring patterns. *Id.* at 309–10, 97 S.Ct. at 2743. In some circumstances, however, proof of pre-Act discrimination may have some probative value, particularly where no change has occurred in the employer's relevant decisionmaking processes. *Id.* at 309 n.15, 97 S.Ct. at 2742 n.15.[11] Additionally, plaintiffs cannot recover for discriminatory acts which terminate beyond the applicable limitations period. Under Title VII, an EEOC charge must be filed within 180 days after the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e). In Louisiana, claims under §§ 1981 and 1983 must be brought within one year of the alleged discriminatory act. *Pegues v. Morehouse Parish School Board,* 632 F.2d 1279, 1281 (5th Cir. 1980); *Page v. U.S. Industries, Inc.,* 556 F.2d 346, 351–52 (5th Cir. 1977), *cert. denied,* 434 U.S. 1045, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978).[12]

■ At the fairness hearing, plaintiffs presented affidavits of prospective witnesses together with facts admitted by the defendants, which they argued demonstrated that they would prevail on the merits.[13] Plaintiffs evidently sought to show their entitlement to relief under both disparate impact and disparate treatment theories. Plaintiffs' labor economist, Marc Bendick, prepared a labor market analysis of hiring and promotion by the NOPD. He concluded that the NOPD employed fewer blacks than would be expected, given the relevant labor market. The following table reflects his findings, as of December, 1980:

| Rank | Expected Proportion of Blacks | Actual Proportion |
|---|---|---|
| Police Officer | 51.8% | 21.8% |
| Sergeant | 40.7% | 3.5% |
| Lieutenant | 39.4% | 3.0% |
| Captain | 37.4% | 0 |
| Major | 30.5% | 0 |

Numerous black officers and former officers also offered affidavits relating personal encounters with racial discrimination on the NOPD. Where a date was specified, a majority of these "vignettes of discriminatory acts" *Rivera v. City of Wichita Falls, supra,* 665 F.2d at 535 n.4, described incidents occurring in the 1950's and 60's. Those officers referring to more recent events complained most often of unfair promotional exams and selection procedures. Some black officers, however, alleged that race continues to be a factor in the allocation of assignments and privileges within the NOPD. Michael Dusset, for example, protested that the NOPD discriminates against blacks in assignment to special units as well as in application of discipline. Thaddeus Freeman voiced a similar complaint. Tyrone Mills charged that the NOPD's residency requirement is routinely waived for whites, but not for blacks. Dana Walker, a black woman, claimed that white women are never assigned to ride in patrol cars with black males while black females are regularly assigned to ride with white males. She also complained that white women are never assigned to the "Urban Squad," which patrols the poorest

---

11. Of course, before Title VII became effective, public employers were subject to the Fourteenth Amendment's prohibition of intentional racial discrimination, as well as to 42 U.S.C. § 1981.

12. In the case of a continuing violation such as a discriminatory failure to promote, a plaintiff may seek relief for acts which occurred outside the limitations period if ongoing when the action was commenced. *Dumas v. Town of Mount Vernon,* 612 F.2d 974, 977 (5th Cir.

1980); *Clark v. Olinkraft, Inc.,* 556 F.2d 1219, 1222 (5th Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978); *see United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

13. Plaintiffs presented only a synopsis of their case at the hearing, and might be able to muster a stronger presentation if the case were tried. I view their evidence broadly in light of this possibility.

city neighborhoods. Others protested discriminatory administration of the psychological and medical exam-background investigation phases of the application process. No statistics were presented to bolster these claims.

Plaintiffs further asserted that written examinations used in promotion and hiring have a discriminatory impact on black candidates. Plaintiffs' psychologist, Elbert Lee Hoffman, found the statistical probability of race not being a factor in an applicant's success on the hiring examination to be less than one chance in a thousand. Hoffman concluded that the differences in rates of selection for white and black applicants to the NOPD were statistically significant, that is, not the result of random variation. Hoffman also examined the sergeant selection procedures conducted in 1972, 1976 and 1979. According to his findings, the 1972 sergeant examination did not produce a statistically significant adverse impact on blacks, but the results did indicate an adverse impact under the "four-fifths" rule of the Uniform Guidelines on Employee Selection Procedures.[14] The 1976 examination results were neither indicative of a statistically significant adverse impact nor violative of the four-fifths rule. Since 37 whites and no blacks had been promoted to sergeant pursuant to the 1979 selection procedures, Hoffman concluded that the 1979 procedures necessarily produced an adverse impact upon black candidates. He found no such impact in lieutenant selection procedures, but concluded that this finding, like those regarding 1972 and 1976 sergeant selection procedures, was misleading due to the truncated pool of black applicants produced by the written examinations used in hiring. In his view, all examinations given by the defendants during the relevant period resulted in adverse impact on black candidates. Plaintiffs also challenged the disparate effect of experience requirements on black candidates for promotion.

It is apparent from the foregoing summary of the plaintiffs' evidence that their ability to succeed on the merits is not free from doubt. At trial, the defendants would be permitted to challenge the techniques and conclusions of the plaintiffs' experts and to present their own expert testimony. But at this juncture, the plaintiffs need only demonstrate a reasonable factual and legal basis for the proposed decree, a burden I find they have carried by demonstrating a likelihood that they could establish a prima facie case of unlawful racial discrimination sufficient to warrant a judicial remedy. Whether their showing provides a legal and factual foundation for the remedies mandated by the proposed decree I reserve for discussion below.

## IV. Class Members' Objections

Eighteen members of the plaintiff class [15] filed written objections to the proposed decree. These objections, of course, do not preclude approval of the proposed settlement if it is a fair, adequate and reasonable compromise of the plaintiffs' claims. The Fifth Circuit has prescribed six factors to be considered in assessing the sufficiency of a class action settlement proposal: (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to prevailing on the

---

14. 29 C.F.R. § 1607.4(D) (1981). The four-fifths rule is a rule of thumb, to be considered together with factors such as sample size in determining whether there is a discriminatory adverse impact. It provides that a selection rate for any minority group which is less than four fifths of the selection rate of the highest group will be regarded by federal agencies as evidence of adverse impact. *See* Shoben, *Differential Pass-Fail Rates in Employment Testing: Statistical Proof Under Title VII*, 91 Harv. L.Rev. 793 (1978).

15. The class certified in this action encompasses:

1. All black persons who have applied for but were denied employment as patrolmen in the New Orleans Police Department.
2. All black persons who are presently police officers or were formerly police officers, who have been subject to racially discriminatory practices in assignments, promotions, discipline and general treatment by their supervisors and other employees.

merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representatives, and the absent class members. *Parker v. Anderson, supra*, 667 F.2d at 1204.

■ I conclude that the settlement embodied in the proposed consent decree readily passes muster as fair, adequate and reasonable to class members.[16] A more favorable settlement is indeed difficult to conceive. The decree requires a complete revision of hiring and selection procedures objectionable to plaintiffs, substantially on their terms; provides for 44 new supervisory positions open initially only to blacks; mandates special procedures governing the recruitment and training of black officers; imposes a quota dictating that whites and blacks be promoted on a one-to-one ratio until blacks comprise fifty percent of all ranks within the NOPD; and establishes a $300,000 backpay fund. At the time settlement was reached, the case was poised for what was certain to be protracted and closely contested trial on the merits. Plaintiffs' counsel estimated, based on his extensive experience in similar employment discrimination litigation, that trial of this action would cost the plaintiffs several hundred thousand dollars. See affidavit of O. Peter Sherwood ¶ 19. Plaintiffs faced the formidable problems of proof inherent in establishing facts such as "intent," compounded by the passage of time since the inception of this action and the defendants' spotty recordkeeping during many of the relevant periods. Their statistical evidence was helpful, but subject to varying interpretation, while potentially troublesome issues regarding Title VII's coverage and statutes of limitation lurked in the background.

In view of these uncertainties, I find it unlikely that the plaintiffs could have proved unlawful employment practices of a character warranting injunctive relief greater than that mandated by the proposed decree. I further find that even if broader relief were probable, the delay in its enforcement caused by a likely appeal, with attendant risks, would alone justify approval of the current settlement. Notably, only a small number of class members have objected to the settlement,—"an important indication of its fairness and adequacy." *Luevano v. Campbell*, 93 F.R.D. 68, 91 (D.D.C.1981).

Certain objectors argued that the plaintiffs' attorneys did not adequately represent the class. Although it is true that lax prosecution once caused the case to be dismissed, since its revival and the enrollment of new counsel I find that it has been pursued with vigor and professional competence. Diligent efforts have been undertaken to notify and consult class members. I perceive no factual basis for a suggestion of inadequate representation.

■ Several objecting class members cited the lack of a definite timetable for implementation as a serious flaw in the decree. Even if this shortcoming alone could render the decree unfair, the reasons for the absence of a precise schedule are plain. Many variables affecting the sequence and pace of events, such as court approval and test development and validation, were beyond the control of the parties negotiating the settlement. Given these limitations, the provisions governing promotions are as specific as feasible. Nevertheless, since preparation of the proposed decree, the parties have agreed that administration of the first round of promotional procedures can be accomplished in fourteen months following appropriation of necessary funds. See Sherwood affidavit, Exhibit "C." Furthermore, any consent decree with injunctive relief is subject to continuing supervision by the court to ensure that its execution is consistent with the law and the understanding of the parties. In light of these safeguards and the impracticability of projecting a precise calendar of events, the lack of a timetable is neither unreasonable nor unfair to class members.

---

**16.** Not even the most strident objecting class member suggests that fraud or collusion is involved in the settlement.

A related objection raised by some class members is that the decree's retention of a one-year probationary period for newly promoted officers prevents immediate promotion of black officers. Seen in perspective, however, this impediment to immediate enjoyment of the full benefits of promotion is a sensible precaution intended to guarantee the selection of qualified supervisory personnel. It affords the defendants no opportunity to thwart the decree's objectives, since any vacancy created by the failure of a black officer to complete the probationary period must be filled by another black officer. All other aspects of the promotional process challenged by the plaintiffs have been eliminated or modified to meet their objections, and trial on the merits would not likely have led to abolition of the probationary period. The contention that this provision affects the fairness of the settlement is therefore meritless.

The purported inadequacy of the $300,000 backpay fund was another subject of complaint by objecting class members. As plaintiffs' counsel noted however, this figure does not represent the full value of the settlement. The decree requires the defendants to fund 44 new supervisory positions, and to appoint black officers to these positions. Counsel calculated the value of the new positions to be $980,000. See Sherwood affidavit, Exhibit "A." I find this estimate reasonable, and the notion that a costly trial on the merits would yield a larger award improbable. I also find that the backpay distribution formula, justifiably weighted to provide larger sums to named and active plaintiffs and to those class members with longer service on the NOPD, is fair and reasonable. The amount of the backpay fund and the arrangements for its distribution represent no obstacle to the decree's approval.

The final significant objection raised by class members concerns the adequacy of the decree's reinstatement provisions. Article XIII of the decree recites that plaintiffs' counsel engaged in persistent efforts to investigate the cases of class members who claimed that they had been discharged for discriminatory reasons. Although the decree states the defendants deny that any officer has been dismissed from the NOPD because of his race, the defendants consent to review the claims of certain class members listed in the appendix to the decree. The few officers objecting to this provision chiefly complain that it mandates only review, not reinstatement. However, in the opinion of plaintiffs' counsel, classwide discriminatory treatment in discipline and discharge could not be proved at trial, although such discrimination could be established in certain individual cases. See Sherwood affidavit ¶ 21. Based on this opinion, I find that the reinstatement provisions, in light of the entire settlement, are fair and reasonable to the class. Subjecting the entire class to the costs and risks of trial in pursuit of relief in a few individual cases is clearly unjustified. The few objecting officers are individuals with interests differing from the class; according to plaintiffs counsel, the settlement agreement incorporated in the decree permits them to be excluded from the lawsuit to prosecute individual claims. See Sherwood affidavit ¶ 21. Like the class members' other objections, their exceptions to the reinstatement provisions do not prevent approval of the decree.[17]

## V. Intervenors' Objections

The limited intervenors and other objecting officers challenge almost every significant provision of the decree. Court approval may be withheld, however, only if at least one of the material provisions under attack produces an unlawful or unreason-

---

**17.** At least two objecting class members also expressed concern about the organization of the Academy Review Panel created by the decree. Sterling Hayes contended that the panel should be more than half black, while Randolph Thomas complained of the participation of the Superintendent of Police. Neither of these objections is substantial. From the viewpoint of black officers, the composition of the panel is eminently reasonable. Its direct accountability to the Superintendent of Police is designed to protect its independence by insulating it from pressures from lower echelons in the department.

able impact on their protectable interests. *United States v. City of Miami, supra,* 664 F.2d at 441; *United States v. City of Alexandria,* 614 F.2d 1358, 1361 (5th Cir. 1980). For convenience, I first address objections to portions of the decree not employing racial classifications, followed by consideration of objections to its race conscious provisions.

**A. Non-Race Conscious Provisions**

█ Many provisions of the decree call for changes in the defendants' employment practices, such as shortening the application process, which are facially neutral with respect to race. While most of these revisions are unchallenged, some are decried by objectors as unreasonable. The female objectors [18] question the decree's reporting provisions, which require the defendants to collect data regarding the racial composition of applicants, recruits, hirees, trainers, candidates for promotion and special training, and recipients of discipline. The women object to the failure to obligate the defendants to collect similar information regarding gender, but do not clearly articulate how this shortcoming requires withholding of approval of the decree. The decree poses no barrier to the collection of such information, and the failure to impose a duty to do so produces no unlawful or unreasonable impact on women officers; it only stops short of supplying them with discovery for future litigation.

█ The women also object to the use of an oral assessment center in evaluating candidates for promotion. At the fairness hearing, intervenors' experts, Drs. Max McDaniel and David Morris, each testified that without sufficient precautions to assure that female candidates were not victimized by the discriminatory attitudes of interviewers, the assessment center technique could discriminate against women. On cross-examination, Dr. Morris conceded that the decree did not specify how interviewers would be trained, and that he was

unaware how the defendants planned to conduct the assessment centers. Thus, the opinion on which the women predicate their objection is that harmful consequences might follow if the procedure specified in the decree is poorly implemented, even though there is no indication in the text of the decree that the interviewers conducting the oral assessment center are to be inadequately trained. I discern no basis for assuming that the assessment centers will be conducted in a way prejudicial to women officers. Like a contract, *see Eaton v. Courtaulds of North America, Inc.,* 578 F.2d 87, 90 (5th Cir. 1978), the decree is entitled to a reasonable construction, not one that strains its language to create obstacles to judicial approval. Once approved, the decree is subject to court supervision to avoid unreasonable results.

█ The proposed decree alters the prevailing experience requirements governing eligibility for assignment as a trainer and for promotion to Police Officers II, III and IV and the supervisory ranks. In the grades of police officer and the supervisory ranks, the cumulative impact of the decree is to lessen the importance of the experience component, thereby qualifying more officers to seek promotion. No serious objection is raised to the lawfulness or reasonableness of these changes. Several white males do object, however, to the eligibility requirements for police trainer. The decree disqualifies officers of any race who have been the subject of five or more citizen complaints of mistreatment, named in two or more non-prisoner lawsuits or adjudged to have acted improperly by police or municipal boards on two or more occasions within two years. Claiming that many groundless complaints are regularly brought against competent officers, the objecting officers argue that the disqualification provision is unreasonable. Whatever its merits in terms of police administration, this argument misconceives the court's role in evaluating a proposed consent decree.

18. The Duke group's claim to represent all women in the police department is somewhat puzzling, since black women are members of the plaintiff class and obvious beneficiaries of the decree. How the decree might harm black women has not been demonstrated.

The court's duty is to determine whether the effect of the relief provided by the decree is unreasonable or unlawful, not to decide whether the number of citizen complaints lodged against an officer is a less reliable index of suitability for a training position than some other measure. The lawfulness of the trainer eligibility provision being necessarily uncontested, the relevant question narrows to whether the scheme selected is so harsh or arbitrary to be unworthy of the court's approval. The plain answer is that this solution to the problem of trainer qualifications is one among many that the parties could reasonably adopt; it is neither irrational nor unduly burdensome to third parties. Whether it could be improved is simply not at issue here.

Likewise, suggestions by some objectors that the net effect of the decree is to lower standards and produce less qualified officers raise issues beyond the well-delineated scope of my review. It is the defendants' responsibility to establish the qualifications for their employees, and to assess what measures must be instituted to ensure public safety. Provided these choices are not unlawful or irrational, they are not subject to judicial scrutiny.

B. Race-Conscious Provisions

The more substantial objections raised by the intervenors are their claims that the decree's race conscious remedies violate Title VII of the Civil Rights Act of 1964 [19] and the equal protection clause of the Fourteenth Amendment. In three recent decisions, the Supreme Court has focused on similar contentions by whites who were denied benefits afforded minorities in the interest of redressing past discrimination. The first of these, *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), was brought by a white applicant to a state medical school, challenging the school's refusal to admit him despite academic qualifications superior to minority applicants admitted through a special admissions program which reserved sixteen percent of the openings in each class for minorities. Four justices declined to resolve the constitutional issue, instead ruling that the special admissions program violated Title VI of the Civil Rights Acts of 1964, 42 U.S.C. § 2000d et seq.[20] Five justices reached Bakke's equal protection claim. Justices Brennan, White, Marshall and Blackmun concluded that the special admissions program satisfied constitutional and statutory standards. Strict scrutiny, they argued, is appropriate only when the chosen classification burdens a minority possessing "traditional indicia of suspectness," such as a history of unequal treatment. *Id.* at 357, 98 S.Ct. at 2782, *quoting San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). Where racial classifications are designed to further remedial objectives, an intermediate level of scrutiny, similar to that applicable to gender discrimination, should guide judicial review. Such classifications therefore must "serve important government objectives and must be substantially related to achievement of those objectives." *Id.* at 359, 98 S.Ct. at 2783, *quoting Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). In voting to uphold the special admissions program, the four justices perceived no constitutional distinction between the use of a quota and use of minority status merely as a positive factor in the admissions process. *Id.* at 378, 98 S.Ct. at 2793.

Justice Powell found the special admissions program constitutionally impermissible, applying strict scrutiny. He maintained that the "guarantee of equal protec-

---

**19.** To bring suit under Title VII, complainants are required to exhaust federal administrative remedies. Though they have not complied with this requirement, intervenors are entitled to argue that the decree should not be approved because it is inconsistent with Title VII's objectives.

**20.** Section 601 of Title VI generally prohibits racial or ethnic discrimination in programs receiving federal funds.

tion cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Id.* at 289–90, 98 S.Ct. at 2748. Even under the strict scrutiny approach, however, a classification may survive if necessary to further a compelling state interest. Justice Powell examined each purpose proffered by the state in support of the special admissions program and found none compelling except the university's interest in a diverse student body, a goal with First Amendment underpinnings. *Id.* at 311–12, 98 S.Ct. at 2759. He concluded that this interest would be more precisely served by an admissions program not employing an explicit racial classification. *Id.* at 319, 98 S.Ct. at 2763. A majority of the justices finding the special admissions program unlawful, the Court ordered that Bakke be admitted to medical school.

The second case was *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). The plaintiff, a white male, instituted a Title VII action protesting his exclusion from a craft training program in favor of black employees with less seniority. The black workers were admitted to the program under an affirmative action plan reserving fifty percent of the trainee positions for blacks until the percentage of black skilled craft workers at the plaintiff's workplace approximated the percentage of blacks in the local labor force. The Court defined the issue sharply.[21] "The only question before us is the narrow statutory issue of whether Title VII *forbids* private employers and unions from voluntarily agreeing upon bona fide affirmative action plans that accord racial preferences in the manner and for the purpose provided in the [instant] plan." *Id.* at 200, 99 S.Ct. at 2726 (emphasis in original). The Court rejected the plaintiff's challenge, holding that the plan did not "unnecessarily trammel the interests of white employees." *Id.* at 208, 99 S.Ct. at 2730. The Court noted that the plan was temporary, and posed no bar to the advancement of white employees. Left explicitly undecided was

"what a court might order to remedy a past proven violation of the Act." *Id.* at 200, 99 S.Ct. at 2726.

The most recent case, *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), involved a challenge to the Public Works Employment Act of 1977's directive that ten percent of federal funds appropriated for local public works be reserved for contracts with minority controlled businesses. The case produced no majority opinion, and a wide range of possible approaches. Justices Stewart and Rehnquist concluded that the measure was constitutionally infirm because it employed a racial classification. Justice Stevens found the process by which Congress created the favored classes faulty and the classifications themselves too casually tailored to survive constitutional scrutiny. Approving the measure, Justices Brennan, Marshall and Blackmun reiterated the view they advanced in *Bakke*: racial classifications disadvantaging nonminority groups are to be upheld if substantially related to the achievement of remedial objectives. *Id.* at 519, 100 S.Ct. at 2796. The Chief Justice, joined by Justices White and Powell, also approved the provision, though subjecting it to closer examination. Finding that Congress had before it abundant evidence of the lack of effective participation by minorities in public contracting, the Chief Justice first concluded that the legislation's remedial objectives were within the power of Congress. He then carefully considered the means Congress chose to fulfill its objectives, to assure that the program was "narrowly tailored to the achievement of that goal." *Id.* at 480, 100 S.Ct. at 2776. His opinion repeatedly emphasized, however, that greater deference was due Congress' exercise of its broad remedial authority than a court's exercise of its "limited remedial powers." *Id.* at 483, 100 S.Ct. at 2777. Noting that no specific applications of the program were challenged, the Chief Justice ruled that the program could withstand a facial constitutional attack. A congressionally authorized waiver, he observed, afford-

---

**21.** Justices Powell and Stevens took no part in consideration or decision of *Weber*.

ed the program some measure of flexibility. The ten percent set aside for minorities also amounted to only a tiny fraction of construction work in the United States. *Id.* at 484–85 n.72, 100 S.Ct. 2778 n.72.

Justice Powell wrote separately to apply the methodology he proposed in *Bakke.* He reasoned that Congress had made sufficient findings of past discrimination in the construction industry to support a compelling governmental interest in redressing such discrimination. *Id.* at 507, 100 S.Ct. at 2789. Turning to the means employed to serve that interest, Justice Powell indicated that Congress, like the federal judiciary, is endowed with a suitable measure of discretion in choosing a remedy, so long as the relief chosen is "equitable and reasonably necessary to the redress of identified discrimination." *Id.* at 510, 100 S.Ct. at 2791. In reviewing congressionally authorized race conscious remedies, courts should weigh a variety of factors, including (1) the efficacy of alternative remedies; (2) the planned duration of the remedy; (3) the relationship between the numerical target set and the percentage of minority group members in the relevant population or work force; (4) the availability of waiver provisions; and (5) the effect of the measure on innocent third parties. *Id.* at 510–11, 514, 100 S.Ct. at 2791, 2793. Evaluating these factors, Justice Powell found that the minority business provision was a prompt method of offering badly needed experience to minority firms, temporary in nature, closely related to the percentage of minority contractors, flexible in administration, and relatively limited in effect on third parties. Accordingly, he voted for its approval.

■ As the preceding discussion of the major cases suggests, the boundary between lawful "affirmative action" and impermissible "reverse discrimination" presently evades precise demarcation. Nevertheless, a few principles may be gleaned from the available decisions. First, in a case involving government actors and judicially approved relief, Title VII affords the intervenors no greater protection and the parties no greater latitude than the equal protection clause of the Fourteenth Amendment. *See Fullilove v. Klutznick, supra,* 448 U.S. at 456 n.7, 100 S.Ct. at 2763 n.7 (opinion of Burger, C.J.); *Regents of the University of California v. Bakke, supra,* 438 U.S. at 328, 98 S.Ct. at 2767–68 (opinion of Brennan, White, Marshall and Blackmun, JJ.) (hereinafter joint separate opinion), 438 U.S. at 287, 98 S.Ct. at 2746 (opinion of Powell, J.) (Title VI of same Act).

■ Second, at least in remedying specific instances of past discrimination, courts need not proceed "in a wholly 'color-blind' fashion." *Fullilove v. Klutznick, supra,* 448 U.S. at 482, 100 S.Ct. at 2777 (opinion of Burger, C.J.); *see United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 165, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977). However, courts may not sanction remedies that compromise constitutional protections.

■ Third, the scope of a race conscious remedy must be designed to correct targeted discrimination and to avoid needless detriment to the rights of others. How specific the findings of past discrimination must be, and how closely related the remedy must be to such discrimination are subjects of dispute. *Compare Fullilove v. Klutznick, supra,* 448 U.S. at 521, 100 S.Ct. at 2795–97 (opinion of Marshall, J.) *with* 448 U.S. at 510–15, 100 S.Ct. at 2791–94 (opinion of Powell, J.) *and Regents of the University of California v. Bakke, supra,* 438 U.S. at 324–80, 98 S.Ct. at 2765–94 (joint separate opinion) *with* 438 U.S. at 269–320, 98 S.Ct. at 2737–2764 (opinion of Powell, J.) In this case, the concern that a remedy correspond to specific findings of past unlawful discrimination is substantially satisfied: I have concluded that it is likely that the plaintiffs could establish a prima facie case of such discrimination. Properly framed, the issue raised by the intervenors is whether the race conscious provisions of the decree unnecessarily exceed their remedial purpose and prejudice the intervenors' judicially cognizable rights. Resolving this question requires close attention to the factual setting from which it arises, and a

weighing of various factors defining the scope and propriety of the proposed relief. These factors include the duration of the remedy, the extent to which third parties' rights are infringed, the relationship between the numerical targets specified in the decree and the proportion of blacks in the relevant population, the efficacy of alternative measures, and the remedy's flexibility. *Fullilove v. Klutznick, supra,* 448 U.S. at 510–11, 514, 100 S.Ct. at 2791 (opinion of Powell, J.); *see Schmidt v. Oakland Unified School District,* 662 F.2d 550, 559–60 (9th Cir. 1981), *cert. filed,* 50 U.S.L.W. 3622 (1982); *Valentine v. Smith,* 654 F.2d 503, 510 (8th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *Ass'n Against Discrimination v. City of Bridgeport,* 647 F.2d 256, 280–84 (2d Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982). Each of the decree's provisions employing a racial criterion must be examined in light of this standard.

Like the plaintiffs in *Bakke, Weber,* and *Fullilove,* the intervenors share a protectable interest: the right to compete for the benefits of public employment on the basis of individual worth and accomplishment, fairly ascertained, without the influence of irrelevant factors such as race. Although they lack contractual entitlement to promotion,[22] they do possess constitutional and federal statutory rights to seek promotion in a system untainted by racial considerations. Such rights may be abridged only "when effectuating a limited and properly tailored remedy to cure the effects of prior discrimination." *Fullilove v. Klutznick, supra,* 448 U.S. at 484, 100 S.Ct. at 2778 (opinion of Burger, C. J.).

Most of the decree's race conscious provisions commit the defendants to take specified action until blacks constitute fifty percent of all ranks within the NOPD, when the decree expires. Dr. Melville Z. Wolfson, an economist, was appointed by the court with the consent of the parties to evaluate the decree's impact on the NOPD, and to estimate how much time its fifty percent objective would require. After analyzing the available data, he concluded that the decree's goal could be achieved in twelve years. This projection, however, is based on several optimistic personnel assumptions provided Dr. Wolfson by the CSC. The pace of implementation of the decree is dependent on the creation of vacancies in the NOPD's ranks and a sufficient influx of blacks to fill the vacant positions.[23] The number of vacancies is in turn dependent on the number of retirements and other separations by current position holders.[24] The rates of retirement and separation suggested to Dr. Wolfson by the CSC—one separation every three years among majors, two annually among captains, ten annually among lieutenants, and thirty annually among sergeants—appear optimistic, especially in view of the defendants' recent efforts to discourage early retirement and retain experienced officers. If so, the time needed to achieve the decree's target would be prolonged. Dr. Wolfson's study further assumed that 125 recruits would enter the force annually, but this assumption is also questionable since the average recruit class numbers 90. In summary, I find that the proposed decree requires no less than twelve years, and probably a still greater time, to reach its objective.[25]

---

**22.** In an earlier opinion in this action, I noted that NOPD promotions fell within the discretionary authority of the CSC. *See Rodriguez v. City Civil Service Comm.,* 337 So.2d 308 (La. App.1976).

**23.** The decree itself contains a provision suspending the operation of the promotional quota whenever the promotion of blacks in a supervisory rank would exceed the proportion of blacks occupying the rank of police officer.

**24.** Dr. Wolfson also assumed that authorized strength would remain stable. Article XII of the decree forbids layoffs at the rank of police sergeant or above.

**25.** The suggestion in support of the decree that its terms will cause more nonblacks to leave the NOPD, thus promoting speedier implementation, is circular. The decree cannot be reasonable enough to win approval if it must drive nonblack officers from the NOPD in large numbers to accomplish its objective within a reasonable time.

■ Article II of the decree directs the defendants to continue their upgraded effort to attract blacks to careers with the NOPD. This commitment is operative throughout the life of the decree. Noting that blacks currently submit over 60% of all applications to the NOPD,[26] the Hispanic officers argue that the recruitment provision lacks a factual basis. The decree, however, merely binds the defendants to continue their recently intensified endeavor to recruit blacks and specifies some added means to be employed, such as sending black officers on recruiting missions to local high schools. Evidently as a result of this effort, the proportion of black applicants to the NOPD rose steadily during the past decade. No bar is raised to efforts to recruit nonblacks, and there is no indication that in practice the decree will preclude such efforts. The provision is remedial in nature, designed to counteract negative attitudes toward police in some portions of the black community,[27] while yielding a larger pool of better qualified black applicants more likely to succeed in police work. As part of an appropriate remedy for prior discrimination, it furnishes no cause to withhold approval of the decree.

■ Similarly, the decree's creation of "buddy" systems for black applicants and recruits results in no serious detriment to their nonblack counterparts. The rate of attrition among blacks at these early phases of the employment process has been undeniably higher than among other groups. Together with revised testing procedures and other measures, the "buddy" systems are designed to correct this discrepancy. Again, the decree does not prohibit the defendants' use of the same techniques with respect to other groups. In the decree's remedial context, I conclude that the inclusion of the "buddy" systems in the decree does not compel withholding of court approval.

■ The rationale for the decree's requirement that half the Academy Review Panel be composed of black officers is less apparent. Presumably, it has been included to immediately increase the number of blacks involved in the training of New Orleans police officers, and to ensure the appearance of fairness in police academy decision making—a permissible remedial goal. No objector has suggested how this goal is outweighed by the limited hardship imposed on nonblacks by their exclusion from half the positions on the panel. Moreover, the composition of the panel reflects the racial composition of current academy classes. The court's role in this proceeding is not to decide whether the defendants have surrendered too much of their authority or responsibility in settling the lawsuit, but to determine whether the decree impermissibly encroaches upon the rights of their other employees. I detect no such encroachment in the restricted membership on the Academy Review Panel.

■ The decree contains several provisions intended to prevent the recurrence of disparate results in written tests used in hiring and promotion by the NOPD. The tests themselves are to be revised by the CSC in consultation with an expert designated by the plaintiffs. Both tests must be as "content valid" as feasible. An item analysis must be performed on the hiring examination; any item that produces a statistically significant adverse impact against blacks must be eliminated. An even more substantial remedial measure is mandated for promotional exams. If a promotional examination as a whole produces an adverse racial impact against blacks, an investigation for the existence of unfairness must be conducted. If unfairness is found to exist "or if it is otherwise appropriate," a separate frequency distribution may be calculated and applied for blacks. Apart from the permitting a separate frequency distribution to be computed, this portion of the decree creates special safeguards to ensure that written examinations do not result in the disproportionate failure of black officers. With no showing that the revised

---

26. See Plaintiff's First Request to Admit Facts, Item 11.

27. See affidavit of Gilbert Johnson.

tests will have an adverse effect on their chances for promotion, nonblack officers have no right to demand that an exam or part of an exam which produces an adverse impact against blacks be administered. Nor does the decree bar the excision of individual questions or entire examinations which produce disparate results with respect to other groups. The remedial intent and impact of this portion of the decree is manifest; the effect on other officers is relatively slight.

 On its face, the language allowing the defendants to calculate a separate frequency distribution for blacks is potentially one of the decree's most far reaching remedial measures. Its effect, however, is moderated by the limited role of the written examination in promotions. Under the revised promotional procedures, the written tests are used only as a qualifying measure for an oral assessment center. Results of the assessment center determine the ranking of candidates for promotion. Thus, if invoked, the separate frequency distribution would not directly result in any black officer with a lower test score being ranked for promotion ahead of a nonblack officer with a higher score. The only imposition to nonblack officers would stem from an enlargement of the pool of candidates competing in the oral assessment center. Further, under the terms of the decree, a separate frequency distribution for blacks is not to be calculated routinely, but only when individual examinations are found to be unfair, or in other unspecified appropriate circumstances. Notwithstanding the relatively confined operation of this provision, because of the duration of the decree and the ambiguity of the terms "unfair" and "appropriate," I will require as a condition to approval that leave of court be obtained before the separate frequency distribution clause is invoked.

 Two provisions of the proposed decree establish constraints included to assure that numerical disparities on the NOPD will not resurface once the decree is approved. The first of these requires that the defendants "adopt measures which, as far as is feasible, will assure that over the course of a calendar year the proportion of blacks that graduate from the police academy will at least meet the proportion of blacks that pass the written entry level examination for the position of police recruit. . . ." The flexibility of this provision is apparent. Rather than mandating a quota, it merely underscores the defendants' commitment to encourage and provide proper aid to black trainees. Though it requires special attention for black trainees, its aim is to remedy the disparate racial effect of past procedures. By its terms, it presents no serious disadvantage to nonblack officers. If, once the decree is approved and the provision becomes operative, such a disadvantage develops, the affected employees would be entitled to challenge its application in court. I conclude that this measure is within the realm of permissible remedies to which the parties could agree.

 The second provision is more stringent, governing appointment to police subclassifications. It requires that the City "adopt procedures which assure that the proportion of white officers selected for appointment to a given classification does not exceed the proportion of white officers who are eligible to be selected for that classification." Unlike the first provision, this language appears to call for a numerical ceiling on the number of whites appointed to each classification. In view of the decree's duration, the impact of this restriction on whites is more than negligible. Even under this constraint, however, whites will continue to obtain these positions in proportion to their interest. Members of all races and ethnic groups will still compete for appointments to each class. The limitation functions as a safeguard against the underrepresentation of black officers, the plaintiffs' basic grievance. Though some white officers may be incidentally disadvantaged, this imposition does not foreclose an appropriately tailored remedy for prior discrimination.

 Article VI of the decree, governing promotions, operates in two stages. The first stage calls for the immediate creation of 44 supervisory positions and the promotion of black candidates to fill these positions. The black officers will be elevated

from existing promotional registers and from new registers to be created following new selection procedures for sergeant, lieutenant and captain. Nonblack officers object to the promotion of blacks ahead of others with higher standing on the existing promotional register. But the decree itself provides for the promotion of sufficient officers from the existing registers to fill all authorized but vacant supervisory positions—a measure that will result in the promotion of at least 12 white officers. Because the 44 new positions would not exist but for the decree, the injury to nonblack candidates is limited to their exclusion from consideration for these new positions; preexisting expectations are unaffected. The duration of the decree also is not troubling in the case of immediate promotions, since no ongoing action by the defendants is required. Reserving the newly created positions exclusively for blacks is a swift and potent remedy for black underrepresentation in supervisory ranks, yet it does not pervasively intrude on the interests of other officers. Most importantly, the burden of this remedy falls on the defendants themselves, who must finance and staff the new positions, not on their other employees.[28]

■ The second stage of the decree's section governing promotions requires that the defendants promote black and white officers on a one-to-one ratio as vacancies arise, until blacks constitute fifty percent of all ranks on the NOPD. For the reasons explained below, I conclude that the decree cannot be approved so long as it includes this provision.

First, the target of fifty percent black representation in all ranks is unsupported by evidence in the record. According to plaintiffs' labor economist, Dr. Bendick, if hiring and promotions on the NOPD had been conducted free of racial considerations, blacks would comprise 40.7 percent of all sergeants; 39.4 percent of all lieutenants; 37.4 percent of all captains; and 30.5 percent of all majors. Even this estimate, however, I find overstated due to certain shortcomings in Dr. Bendick's generally reliable analysis.[29] While Dr. Bendick confined the relevant labor market to Orleans Parish, in the past the defendants have regularly solicited applications from outside the parish to meet their personnel demands.[30] Most of the areas outside Orleans Parish from which recruits are drawn evidently lack substantial black populations. Moreover, while Dr. Bendick properly referred to applicant data in constructing the relevant labor market, *Markey v. Tenneco Oil Company*, 635 F.2d 497, 500–01 (5th Cir. 1981), the evidence indicated and the decree recites that the defendants have engaged in a special effort to recruit blacks. Relying on applicant data therefore may not convey an accurate picture of the actual labor market for the NOPD. *See Castaneda v. Pickard, supra*, 648 F.2d at 1003. Together these difficulties would have the effect of lowering Dr. Bendick's estimate of the percentage of blacks that would constitute each rank on the NOPD had personnel decisions been reached in a race free manner. Since for purposes of this proceeding I need not calculate a specific figure, I find only

28. Article VIII of the decree provides that if a black officer promoted pursuant to the decree fails to complete the probationary period for his rank, he must be replaced by another black officer. This measure reinforces the revised testing procedures and promotional provisions of the decree, with only marginal intrusion on the rights of other officers.

29. At the fairness hearing, intervenors' experts, Drs. McDaniel and Morris, disputed Dr. Bendick's approach and presented their calculation of the expected labor market. Their analysis indicated that blacks were overrepresented on the NOPD in light of the relevant labor market. However, their approach was less sophisticated than Dr. Bendick's, not considering at all, for

example, applicant flow data. In general, I find Dr. Bendick's study more reliable.

I have highlighted only a few shortcomings in the data on which Dr. Bendick relied. At a trial of this action, it is likely that several components of his analysis would be questioned by the defendants.

30. Evidence adduced at the hearing indicated that the City does not require applicants to be residents of Orleans Parish, but only requires that officers move inside the parish within one year of hiring. In some cases, this requirement is waived by the City. See testimony of Leroy Aucoin.

that the percentage of blacks expected in each rank is somewhat lower than Dr. Bendick's generally helpful projection.

Second, the impact of the quota on non-black aspirants to promotion is harsh. Because nonblacks predominate at every echelon of the NOPD, they necessarily will seek promotion in greater numbers than blacks, at least in the early years of the decree. Consequently, the quota in effect would create separate promotional tracks: one for black officers, with fewer candidates and better prospects for success; the other for nonblacks, with more candidates and intensified competition. Coupling this situation with the difficulties inherent in winning promotion in paramilitary organizations such as police departments,[31] a nonblack officer's chances for promotion under the decree would appear slim. The outlook would be particularly bleak for white and Hispanic women, already represented on the NOPD in only small numbers, and under the decree confronting heightened competition from males for a reduced number of vacancies.[32]

The quota's disabling impact is seriously aggravated by the decree's duration. The minimum twelve years required to reach the decree's terminal point would span almost the entire career of many nonblack officers. Having joined the NOPD either after or immediately before entry of the decree, the officers most affected could not even arguably have benefited from prior discrimination, yet would suffer the brunt of the prescribed remedy. Although some whites and Hispanics would be promoted under the quota, inevitably others, who would have advanced under a regime unencumbered by racial criteria, would be held back.

Third, the quota is unnecessary to afford complete relief to the plaintiffs. Viewed as a whole, the remainder of the settlement guarantees that blacks will be substantially represented on the NOPD. The measures set forth in the decree far exceed a simple cessation of discriminatory acts. Selection procedures are to be revised on terms most favorable to the plaintiffs. The defendants must consult with the plaintiffs' expert in developing new selection procedures. An item analysis must be performed on all written tests used in hiring. All questions with a statistically significant adverse impact on black candidates must be eliminated, regardless of the effect of the test as a whole. Written examinations are assigned only a limited role in promotions, serving merely to qualify candidates for a decisive oral assessment center. Even so, if the tests prove unfair to black candidates, a separate frequency distribution may be calculated for their benefit. The net effect of these revised selection procedures is to ensure that blacks will advance through the ranks at the same pace as nonblacks. The decree, however, provides still further measures to secure this objective. Recruiting and training procedures are altered to focus special attention on developing black officers. The defendants must adopt procedures to assure that the proportion of blacks who graduate from the police academy at least meets the proportion of blacks who pass the written hiring examination. The proportion of whites selected for special police classifications cannot exceed the proportion of whites eligible for appointment. If a black officer is promoted and fails to complete the probationary period for his rank, he must be replaced by another black officer. Perhaps most importantly, the proportion of black officers in supervisory ranks is significantly and immediately increased by the promotion of black officers to 44 newly created positions.[33]

As a result of these provisions, the objective of the plaintiffs' suit ultimately will be achieved without the need for a quota—the most rigid and intrusive form of remedy. Since whites and Hispanics currently out-

---

**31.** See testimony of Dr. David Morris.

**32.** Unlike *City of Alexandria*, where a federal agency brought suit against a municipality on behalf of blacks and women, here black plain-

tiffs have brought suit against a municipality and its civil service commission to vindicate solely their own rights.

**33.** Backpay is also awarded to class members.

number blacks in the supervisory ranks, they necessarily will outnumber blacks in future retirements from these positions. Under the decree, blacks can be expected to fill these vacancies at least in proportion to their interest. Thus, without the proposed quota, the decree's other provisions ensure that blacks eventually will occupy all ranks in accordance with their participation in the labor market. Federal antidiscrimination laws seek no other goal.

On balance, I conclude that the proposed quota exceeds its remedial objectives while seriously jeopardizing the career interests of nonblack officers. If allowed to take effect, it would infringe constitutional and federal statutory rights of these officers. Consequently, though its provisions are otherwise acceptable, I cannot endorse the proposed decree until the quota governing future promotions is deleted.

I encourage the parties to modify the decree in a manner consistent with this opinion and resubmit it for approval. By no means do I foreclose the alteration of the decree to propose further measures that the parties deem appropriate, so long as they are precise, remedial in nature, and attentive to the interests of third parties.

Accordingly, the joint motion for approval of the proposed consent decree is DENIED.