Larry WILLIAMS, et al.,
Plaintiffs-Appellants,

v.

The CITY OF NEW ORLEANS, LOUISI-
ANA A Municipal Corporation, et al.,
Defendants-Appellees.

No. 82–3435.

United States Court of Appeals,
Fifth Circuit.

Dec. 16, 1982.

Opinion on Rehearing and Rehearing
En Banc Feb. 14, 1983.

O. Peter Sherwood, New York City, for plaintiffs-appellants.

Dale C. Wilks, New Orleans, La., for intervenors Perez etc.

Sidney Bach, New Orleans, La., for Venezia, et al.

Gilbert R. Buras, Jr., City Atty., Galen Brown, Asst. City Atty., New Orleans, La., for all defendants-appellees.

Lynne W. Wasserman, New Orleans, La., for Cindy Duke, et al.

Ralph D. Dwyer, Jr., New Orleans, La., for Civil Service Comn.

Before WISDOM, REAVLEY and TATE, Circuit Judges.

TATE, Circuit Judge:

The plaintiffs appeal from the district court's denial of approval to a proposed consent decree in this Title VII employment-discrimination case. 543 F.Supp. 662 (E.D.La.1982). Such denial has been held to be an appealable order. *Carson v. American Brands, Inc.,* 450 U.S. 79, 84 & n. 14, 101 S.Ct. 993, 998 & n. 14, 67 L.Ed.2d 59 (1981). The proposed consent decree terminating the class action was negotiated between the defendants (the City of New Orleans, the Civil Service Commission, and various city officials) and the plaintiffs—a class of black applicants and members of the New Orleans Police Department who complained of racially discriminatory policies in the selection, training, and promotion of city police officers.

We need not here repeat the detailed analysis by the district court of the proposed consent decree and of the objections of various intervenors.[1] It is sufficient here to say that the court approved all aspects of the lengthy and comprehensive plan for redressing past discriminatory practices against blacks, except one. The court withheld approval of the entire consent decree, only because of a provision requiring promotion to officer grades of one black for every white policeman until black officers constituted 50% of all ranks of the Police Department, because the court felt that this provision unreasonably affected white, female, and Hispanic police officers in their career aspirations. We conclude that, under the existing jurisprudence, the district court erred in concluding that the quota governing future promotions was not an appropriate or necessary remedy to afford complete relief to the plaintiff class of black officers and that the minimum twelve years duration of the plan aggravated its unreasonableness. We likewise find that the district court was clearly erroneous in its factual finding that the target of fifty percent was unsupported by evidence in the

1. The intervenors were a large class of white police officers, a class of women officers, a class of Hispanic officers, and a small class of black officers who felt the decree afforded insufficient relief for past discriminatory practices.

record. Accordingly, we reverse, and we remand to the district court with directions that it enter the consent decree.

*Factual Overview*

The provision of the proposed 34-page consent decree found by the district court to be objectionable was with regard to "promotions" in the decree's Section VI:

Defendants shall approve and make promotions of black officers on an accelerated basis pursuant to the formula set forth below until black officers constitute fifty percent (50%) of all ranks within the NOPD at which time this Decree shall cease to be operative.

\* \* \* \* \* \*

C. *Future Promotions.* After paragraph VI–B has been accomplished [a measure providing temporary relief by creation of additional supervisors], the Defendants will approve and promote qualified black and white officers on a 1–1 ratio as vacancies arise. At no time must blacks be promoted on this basis if to do so will result in a proportion of black officers in the rank of sergeant, lieutenant, captain or major, separately considered, that exceeds the proportion of blacks then occupying the rank of police officer. The initial promotion to each rank made pursuant to this subparagraph shall go to a white officer.

This provision was proposed in the light of the following statistics as to the composition of the police department on August 28, 1981. There were 1007 non-ranked police officers (736 white, 229 black, 42 other), but in the upper ranks from sergeant to major (in addition to 12 white male desk sergeants) the racial composition broke down as follows:

*Sergeant,* 5 black, 171 white, 11 other— total 187;

*Lieutenant,* 2 black, 63 white, 2 other— total 67;

*Captain,* 0 black, 20 white, 3 other—total 23;

*Major,* 0 black, 5 white, 1 other—total 6.

Without detailing the evidentiary showing, which indicates New Orleans to have over a 50% black population and which affords a substantial basis for finding that the qualified pool of black applicants for these ranks should reasonably have produced at a minimum, if promotion were made on a nondiscriminatory basis, between 25% and 40% blacks in these ranks by 1980, we note only the miniscule percentage (about 3%) of blacks in the sergeant and lieutenant ranks, with no blacks serving as captain or major. We note further the district court's finding, in approving other portions of the proposed consent decree, that the police department's past hiring, training, and other policies could reasonably be said to have resulted in discrimination against black applicants and black policemen. By way of prelude, we note also that, upon a showing of this nature, "[a] consent decree may properly include provisions requiring the defendants to take affirmative action rectifying the effects of past discrimination." *United States v. City of Miami,* 664 F.2d 435, 442 (en banc) (Rubin, J., plurality), 461 (F. Johnson, J., dissenting, agreeing as to this) (5th Cir.1981).

*Issues*

In urging that the district court erred in rejecting the proposed consent decree, the plaintiffs principally argue: (1) that the standard of review of the *rejection* of a consent decree ending long discriminatory employment practices requires the appellate court to make a de novo determination, rather than to apply an abuse of discretion standard; and (2) that even if the latter standard applies, we should hold that the district court abused its discretion in rejecting the consent decree (a) because it committed clear legal error insofar as it based its holding on a legal conclusion that the use of promotion quotas (affirmative action) was inappropriate to remedy past discriminatory effects under the facts of this case and (b) because it was clearly erroneous in its finding that the target of 50% black representation was unsupported by evidence in the record. The intervenors-appellees (*see* note 1 *supra*) urge, to the contrary, that no abuse of discretion is reflected by the district court's conclusion

that the promotion quota unreasonably affected the rights of third persons, *i.e.,* whites, women, and Hispanic police officers.

## I. Standard of Review of the District Court's Rejection

■ Title VII consent decrees should be viewed in light of Congress' determination that voluntary compliance is a preferred means of enforcing nondiscriminatory employment policies and practices. *City of Miami, supra,* 664 F.2d at 442. Because a consent decree, more than a contractual settlement between the parties, has the binding force of a judgment and reaches into the future and has continuing effect by virtue of its injunctive provisions, however, the district court has an active role in deciding whether or not to enter the decree. It must determine that the proposed settlement "represents a reasonable factual and legal determination based on the facts of record.... *If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed.*" *City of Miami, supra,* 664 F.2d at 441 (emphasis added).

■ In Title VII litigation, consent decrees enjoy a presumption of validity. *United States v. City of Alexandria,* 614 F.2d 1358, 1359, 1362 (5th Cir.1980). In practice, district courts have generally approved proposed settlements, and the appellate court has rarely reversed, indicating that a reversal is appropriate only where the reviewing court finds that the trial court has abused its discretion in determining that the decree is not unlawful, unreasonable, or inequitable. *United States v. City of Jackson,* 519 F.2d 1147, 1151 (5th Cir.1975); *see also City of Alexandria, supra,* 614 F.2d at 1361 & n. 6.

In urging de novo review, the plaintiffs rely, however, upon *City of Alexandria,* where this court undertook de novo review of the district court's *rejection* of a consent decree, with terms similar to the present, entered into between the Department of Justice and a Louisiana municipality. Nevertheless, under the principle set forth in the cited decision, we find that de novo review, that would permit this court to make its own factfinding independent of the district court's evaluation, is not appropriate under the present facts. In *City of Alexandria,* we cautioned: "We do not carry the mistaken notion that heightened review of district court refusals to enter consent decrees will resolve the almost intractable problems [in evaluating affirmative action] consent decrees," *Id.* at 1362. We further observed: "The degree of appellate scrutiny must depend on a variety of factors, such as the familiarity of the trial court with the lawsuit, the stage of the proceeding at which the settlement is approved, and the types of issues involved." *Id.* at 1361.

In the present case, the district court had great familiarity with the parties and issues and had heard testimony from the parties and intervenors during the four-day hearing, unlike the trial court in *City of Alexandria.* No parties there objected to the consent decree. Therefore, the appellate court reviewed de novo the relatively uninformed decision of the district court to disapprove sua sponte the decree. Further, distinguishably from the present case, in *City of Alexandria* the district court did not afford interventions and a hearing to ensure protection of the rights of third parties; in that case, therefore, no reason was suggested for the appellate court to defer to any district court factfinding expertise, familiarity with the alleged wrongdoing and remedy, or its protection of third party interests.

We thus do not find that *City of Alexandria* is authority, as contended by the plaintiffs, that de novo appellate review is appropriate in all circumstances where the district court has refused to approve a proposed Title VII consent decree eliminating past discriminatory employment practices. That decision does recognize the presumptive validity of proposed consent decrees and the burden upon objectors to prove that a decree is unreasonable, unlawful or inequitable or has proscribed adverse effect on third parties, and it does recognize that such trial court does not possess "unchal-

lengeable unilateral power to slow [the] pace ... of well-intentioned efforts to eradicate the effects of past discrimination and prevent future discrimination." *Id.* at 1362. Nevertheless, the decision's emphasis upon flexible appellate review depending upon the circumstances of the district court's rejection of a consent decree contradicts any broad holding that always, whatever the circumstances, an appellate court will review the denial of a consent decree de novo and without affording weight to the exercise by the district court of any discretion it may have to approve or reject a proposed consent decree.

■ We conclude, therefore, that under present circumstances the district court's denial of the present proposed decree is reviewable under the abuse-of-discretion standard, just as would have been its approval. The circumstances particularly upon which we rely include the district court's consideration and careful weighing, after a substantial evidentiary showing and its prolonged familiarity with the circumstances of the case, of the interests of the plaintiff black officer class as opposed to those of the intervening white, female, and Hispanic officer classes.

## II. *Abuse of Discretion?*

The district court rejected entirely the promotion provision requiring that the defendants promote black and white officers on a one-to-one ratio as vacancies arise until blacks constitute fifty percent of all ranks, stating conclusively that it "cannot endorse the proposed decree until the quota governing future promotions is *deleted.*" 543 F.Supp. at 686 (emphasis added). It found that the quota would exceed its remedial objectives and jeopardize the career interests of nonblacks for three reasons: first, because the 50% target is unsupported by evidence in the record; second, because the impact of the quota on nonblack aspirants to promotion is "harsh," given that it would create separate promotional tracks and would be in effect too long; and third, because the quota, "the most rigid and intrusive form of remedy," is "unnecessary" to afford a complete remedy. *Id.* at 685–86.

## A. *Promotion Quotas*

In rejecting the promotion-quota scheme of the consent decree, the district court particularly relied upon the following principles, which it educed from *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), and *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978):

> [T]he scope of a race conscious remedy must be designed to correct targeted discrimination and to avoid needless detriment to the rights of others.... Properly framed, the issue raised by the intervenors is whether the race conscious provisions of the decree unnecessarily exceed their remedial purpose and prejudice the intervenors' judicially cognizable rights. Resolving this question requires close attention to the factual setting from which it arises, and a weighing of various factors defining the scope and propriety of the proposed relief. These factors include the duration of the remedy, the extent to which third parties' rights are infringed, the relationship between the numerical targets specified in the decree and the proportion of blacks in the relevant population, the efficacy of alternative measures, and the remedy's flexibility.

543 F.Supp. at 680–81.

■ An essential part of the district court's reasoning was that the other measures of the consent decree would "ultimately" or "eventually" afford black police officers relief by way of equal access to the upper ranks of the police department, so that therefore no need was shown for a promotion "quota—the most rigid and intrusive form of remedy." 543 F.Supp. at 685. In reaching this conclusion of mixed law and fact, the district court erred as a matter of law insofar as it holds that the use of quotas to end present effects of long years of past discrimination may be disap-

proved simply because other measures will, over the course of future years, end the present effects of past discrimination—in this case, a grossly disproportionate, miniscule percentage of black police sergeants and lieutenants and no black police captains and majors.

As we held in *City of Alexandria,* approving a 50% black-white quota for fire and police departments, "a goal which seeks the same racial proportion among employees as in the labor force will ordinarily be reasonable ... absent unusual circumstances or undue hardship to nonminority workers." 614 F.2d at 1336 n. 18. *See also United States v. City of Chicago,* 663 F.2d 1354, 1360 (7th Cir.1981) (en banc); *Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671, 696 (6th Cir.1979).

 The plaintiffs are therefore correct that a settlement providing for race conscious relief by way of an affirmative action quota may be approved where it is reasonably related to the legitimate state goal of achieving equal employment opportunities. *City of Miami,* 664 F.2d at 461; *City of Alexandria,* 614 F.2d at 1366. In determining whether to approve or reject a proposed decree, the district court's function is not to tailor the relief to what it considers "necessary," as it might when fashioning relief itself after trial on the merits. *See City of Alexandria,* 614 F.2d at 1362.[2] Quotas for black selection may be intrusive, but they are within the scope of a reasonable settlement so long as the interest of nonblacks "are not unnecessarily trammelled." *Weber,* 443 U.S. at 208, 99 S.Ct. at 2730.

The 50% promotion quota and the one-to-one implementing plan were proposed to redress the disparities resulting from the New Orleans Police Department's long-continued past discriminatory hiring and promotion policies; they were adopted (and may be regarded as reasonably "necessary")

to ensure a rapid, rather than "eventual" equalization of races in the higher police ranks. As a numerical commitment to immediate increased black representation, a quota serves a different purpose from the other provisions, which in this case and in *Detroit Police Officers Association, supra,* for example, involved educational and testing reforms in addition to the promotion quota.

 The district court therefore abused its discretion insofar as it scrutinized the promotion quota beyond the need to determine whether it was reasonably related to the permissible goal of remedying past-discriminatory practices that had resulted in gross under-representation of blacks in the police supervisory ranks.

The court could, of course, properly take into consideration whether the use of the promotion quota would "unnecessarily trammel" the interests of nonblacks. It concluded that the quota did so because the evidence did not support a target quota of 50% for black applicants and because it felt that the prospective duration of the decree, a minimum of twelve years, aggravated the decree's adverse effects upon the career aspirations of nonblacks. We now address these conclusions.

B. *Finding that target of fifty percent black representation in all ranks unsupported by the evidence: Clearly erroneous? Abuse of discretion?*

 Despite virtually undisputed evidence that the population of New Orleans is presently 55% black (census figures) and that approximately 67% of applicants for entry to the police department are black (admittedly swelled by intensified efforts to recruit blacks) (Record Excerpts, p. E94, 106, Table G), of whom 48.2% pass the examination and were qualified for appointment under the testing procedures (R. VIII, p. 1962), the district court found the 50%

---

**2.** The district court implicitly relies on Justice Powell's (concurring) analysis in *Bakke* and Chief Justice Burger's (plurality) analysis in *Fullilove* that state that race conscious remedies must be "closely tailored" to specific in-

stances of discrimination. This analysis does not relate directly to consent decrees, in which the parties shape the relief themselves rather than rely on the court's imposition of an appropriate remedy.

target for promotions unsupported by evidence in the record.

The district court praised highly the plaintiffs' expert labor economist who determined the percentage of blacks in the relevant labor market and the expert's projections on the racial composition of the supervisory ranks of the police department as of December, 1980 had the police department been nondiscriminatory in hiring and promotion practices. Noting that the figures were nevertheless probably somewhat overstated, the district court pointed out that this expert's calculations showed that, even if the police department had not engaged in racially discriminatory hiring and promotion practices, the percentage of black sergeants, lieutenants, captains, and majors in 1980 would have been only 40.7%, 39.4%, 37.4% and 30.5% respectively. 543 F.Supp. at 684.

We note, however, that these latter figures were arrived at by the expert in calculating the expected percentages of black supervisors as of 1980, if race-free methods of hiring and promotion had been followed from 1947 onwards. The thrust of the other statistical analysis presented by him (accepted by the district court as demonstrating the requisite "reasonable factual and legal basis," 543 F.Supp. at 674, for the other provisions of the proposed decree facilitating entry and training of blacks to redress past discriminatory practices), however, is that the black proportion of the labor pool had dramatically increased year by year, with the increasing educational opportunities for blacks and with the increase in the black proportion of the city's population. The 1980 estimated black supervisor figures, thus, were derived from a 1947 base of 26.4% blacks in the labor pool, increasing year by year until the base reached 50.5% in 1974 and 67.9% by 1980. See Table G, Record Excerpts, p. E–106. The 1980 estimated supervisor percentages, therefore, were used to illustrate present effects of past discrimination; they in no sense furnished a top limit for the remedial goal, since the other figures indicate that the present percentage of blacks in the labor pool has increased to well over 50% (67.9%, to be exact). Id.

The district court inferentially agreed that the relevant labor pool is the appropriate base upon which an affirmative action target quota may be founded. However, it discounted the black proportion of the labor pool as "somewhat lower" 543 F.Supp. at 685, than the 67.9% figure arrived at by the expert, for two reasons: (a) the showing that the figure was in part inflated by the recent aggressive efforts to recruit black candidates for entry into the police department and (b) more central to its reasoning, by accepting suggestions of the intervenor's experts that the relevant labor market was not only the City of New Orleans (the population area upon which the expert based his calculations), but the entire metropolitan area surrounding New Orleans. 543 F.Supp. at 684–85. The intervenor's experts had thought the greater area (with its much larger proportion of whites in the population) was more appropriate because, in fact, the New Orleans police department had recruited applicants from these areas when it did not receive sufficient qualified applicants from inside the City of New Orleans. As the plaintiffs point out, however, the primary labor pool for the New Orleans police department is restricted by statute to the City of New Orleans by La.Rev.Stat. 33:2411, which requires the City to hire city residents and affords permission to accept nonresident applications "[w]henever, after diligent effort, it has been found impracticable to obtain a sufficient number of eligibles who are ... qualified voters of the city."

We see no flaw in the plaintiffs' argument that the relevant labor pool is determined by the population of the city itself, not of the adjacent areas, and that, in this regard, the circumstance is not weighty that in the past the city has accepted nonresidents upon not securing applications from enough qualified voters in the city. The plaintiffs point out that a reason for an insufficient number of resident applicants, thus triggering nonresident entry into the police force pool, was that the pool of available city residents was substantially re-

duced by the exclusion of a substantial portion of the black population from availability by discriminatory selection and testing procedures, which the district court accepted as affording a sufficient basis for remedial measures of the consent decree that eliminated these discriminatory hiring and testing practices.

■ Having found that the district court was clearly erroneous in finding that no evidentiary showing justifies a 50% target quota for blacks based on their racial proportion of the labor pool, the remaining issue is whether the district court abused its discretion in disapproving the presumptively-valid consent decree because the affirmative action quota for blacks was fixed at this percentage. From what we have already said, it is apparent that perhaps the principal error, and one of law, not fact, was the district court's acceptance of objections to that figure based upon the argument that the labor pool extended so as also to include the population of mostly white parishes surrounding the city—since applicants resident in these parishes were statutorily not eligible for appointment to the police force unless there was an insufficient number of qualified resident applicants. The undisputed figures show that 67.9% of applicants for the police force are black, Table G, *supra;* Stipulation, R. VIII, p. 1961, and that blacks comprised 48% of the successful applicants who passed the required tests as of 1980, Table F, Record Excerpts, p. 105; Stipulation, R. VIII, p. 1962. Considering all these figures together with the gross population, the undoubted continuing increase in the black percentage of the labor pool for police applicants resident in New Orleans, we find the proposed 50% black target quota to be reasonably based and that it does not furnish by itself

adequate reason for the exercise of district court discretion to reject the presumptively valid consent decree.

The Supreme Court noted in *Weber* that the quota percentage is a relevant consideration in approving the decree. 443 U.S. at 209, 99 S.Ct. at 2730. In the present case, in finding that the present fifty percent black representation target was unsupported by the record, the district court overlooked the presumption of validity accorded consent decrees and the burden of the objectors to establish that, under all circumstances, a particular provision renders the entire contract unreasonable. The district court did not seem to begin with the assumption that "a goal which seeks the same racial proportion among employees as in the labor force will ordinarily be reasonable." *City of Alexandria,* 614 F.2d at 1336 n. 18.[3] *Accord, Stotts v. Memphis Fire Department,* 679 F.2d 541, 553 (6th Cir.1982); *United States v. City of Chicago,* 663 F.2d 1354, 1360 (7th Cir.1981) (en banc); *Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671, 696 (6th Cir.1979).[4] *See also Weber, supra* (in finding that 50% quota plan did not "unnecessarily trammel" white employee interests, the court noted that preferential selection would continue until "the percentage of black skilled craftworkers . . . approximates the percentage of blacks in the local labor force").

■ The evidence relied upon by the intervenors does not rebut the presumption of reasonableness of the 50% figure, since it does not tend to show that the target set by the parties to the consent decree is not reasonably related to the remedial purpose of correcting racial imbalance caused by

---

3. In that decision, we also cautioned that "The extent of an acceptable plan cannot be measured with mathematical exactitude. . . . Goals and targets, set at reasonable levels, can afford [a] degree of flexibility." *Id.* at 1366.

4. The presumption of reasonableness accorded a quota reflecting the percentage of blacks in the relevant labor market was derived from the *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct.

1843, 1857 n. 20, 52 L.Ed.2d 396 (1977). There the Supreme Court found, with respect to statistical evidence making out a Title VII violation, that "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired."

past employment practices. *City of Alexandria*, 614 F.2d at 1366–67.[5]

### C. *Harsh impact on third parties: white, female, and Hispanic police officers.*

The district court in part relied upon the present circumstance that nonblacks greatly predominate at every echelon, so that nonblack candidates in much greater numbers than black aspirants would be in intensified competition for their fifty percent share of the vacancies and thus have much slimmer chances for promotion. This reasoning overlooks the fact that present great disparity between numbers of blacks and nonblacks is due to past discriminatory practices, and that "temporary" affirmative action quotas are an acceptable and approved remedy to redress long-term past discriminatory practices.

■ Under these circumstances, preferential treatment of victims of past discrimination may reasonably be afforded, even though some of the burden of remedying past discrimination is borne by other employees themselves innocent of the wrongdoing. *Franks v. Bowman Transportation Company*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). *See also Weber, supra*, 443 U.S. at 208–09, 99 S.Ct. 2730, holding that a 50% quota for blacks admitted as new employees in an industry's craftsmen training program did not "unnecessarily trammel the interests of the white employees" where no discharge-replacement feature was envisioned and where no "absolute bar" to white advancement was contemplated ("half of those trained in the program will be white"), where the plan was a "temporary measure . . . not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance."

We further observe that, unlike the undoubted circumstance that white officers may suffer some adverse effects from the black promotional target, the district court's fears as to adverse effects upon women and Hispanic police officers do not seem to be founded upon any substantial showing. The provision redressing supervisory imbalance of blacks is not necessarily inconsistent with a class of women officers (who, after all, are of both races) being afforded similar relief in an independent action, *cf. Detroit Police Officers' Ass'n, supra*, 608 F.2d at 681 n. 3, while Hispanics, with 3.4% of the population, at present are adequately represented in the supervisory ranks (3.5% of sergeants, 3.0% of lieutenants, 12.7% of captains, 16.7% of majors).

■ The district court found that the expected duration of the consent decree—at least twelve years, as testified by the court-appointed expert—aggravated the harsh impact of the quota on nonblacks. 543 F.Supp. at 685. Earlier, we determined that the creation of an affirmative action quota of 50% black promotions is not an unreasonable remedy for long-continued past discrimination. To the extent that the district court also rejected the consent decree because of its prospective duration in affirmative action quotas, we likewise find that the district court abused its discretion, for under present jurisprudential tests, insofar as necessary to remedy past discrimination, a duration of this nature may be regarded as temporary and as not unreasonable or unlawful in its effect on third parties.

The Supreme Court in *Weber* approved the employer's 50% quota, in part because "the plan is a temporary measure; it is not intended to maintain racial imbalance." 443 U.S. at 209, 99 S.Ct. at 2730. The Court did not discuss the particular number of years involved in the plan's implementation, but simply stated that "[p]referential selection [of blacks] . . . will end as soon as the percentage of black[s] . . . approximates the percentage of blacks in the local labor force." *Id.* This court in *City of Alexandria* also found that a 50% percentage goal in a consent decree was "temporary," be-

---

5. In *Weber*, for instance—where the black labor force was found to be 39%, *see* 443 U.S. at 200, 99 S.Ct. at 2725, and the quota was 50%—the Court refused to find the plan unreasonable since it was "not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." *Id.* at 208, 99 S.Ct. at 2730.

cause it "will terminate when the manifest [racial] imbalances have been eliminated." 614 F.2d at 1366.

A "temporary" quota is thus a hiring or promotion percentage that provides for termination when the detrimental effects of past discrimination are redressed, *i.e.*, when the appropriate percentage goal is met.[6] Although we cannot say that a reviewing court could not find unreasonable a quota whose implementation involves a duration, for example, of the career years of an entire generation of employees, we find that here, under *Weber* et al., the percentage of the present quota, its implementing terms, and therefore, its duration, cannot be regarded as unreasonable or unlawful.[7]

*Conclusion*

For the above reasons, we find that the district court abused its discretion by denying approval to the presumptively valid consent decree tendered by the parties, which decree will end long years of litigation and attempts to remedy many, many years of police hiring, training, and promotional practices that were discriminatory to applicants from the black population of the City of New Orleans. Accordingly, we reverse its order denying approval, and we remand this case to the district court with directions that it enter the consent decree as tendered.

All parties have asked this court to expedite its action because the present promotion list will expire on January 23, 1983, and because the process of preparing and administering a new promotion roster will require at least eight months. We therefore direct the Clerk of Court to issue this mandate forthwith. Fed.R.App.P. 41(a).

REVERSED AND REMANDED, WITH DIRECTIONS.

REAVLEY, Circuit Judge, dissenting:

I dissent, because I find no error of law or discretion in the district judge's decision. He did not reject the use of racial quotas; he rejected the one-to-one promotion ratio to guarantee a proportion of black supervisors, matching what plaintiffs' expert thought would be the labor market for entering patrolmen and patrolwomen, in view of all of the other provisions of the plan to eliminate and correct past discrimination and in view of the effect of the degree and duration of the promotion quota upon the great majority of New Orleans police officers.

I know of no rule of law that requires a court to approve that feature of an agreement between black plaintiffs and a city administration—regardless of the certainty or uncertainty of opinions of the future number of police officers (by race) eligible for promotion—regardless of the detail and reach of other corrective changes—and regardless of the effect on other persons who, despite merit, suffer from the blemish of race. If that now becomes the law, I think it unwise as well as unreasonable, unnecessary, and even unconstitutional.

Our disposition of this appeal should turn upon the discretion we allow the district judge. I understand the rule of this circuit to be stated in the en banc opinions of *United States v. City of Miami*, 664 F.2d 435 (5th Cir.). Even where no party objects but because members of a class or persons in an unrepresented class are adversely affected, the district judge is required to give careful consideration to a proposed consent decree and to exercise discretion in the decision to approve or disapprove. That decision may be reversed on appeal only if it is an abuse of discretion. 664 F.2d at 442. When objection comes from one who has full party standing, the consenting parties must demonstrate the propriety of the relief to which they have agreed, and the district court may decline to approve if it is shown to be inadvisable. 664 F.2d at 447, 448.

Approximately three-fourths of the New Orleans police officers are objecting to this proposed decree. While they seek to intervene, that is so far denied to them except to a "limited" extent. I assume they have no due process complaint as did the Fraternal Order of Police in *City of Miami*, but their objections were properly weighed by the district judge and should be by us.

The district court has approved the proposed settlement and is prepared to enter a 33-page decree drastically revising the recruiting, hiring, training, and promotion

---

**6.** A consideration may be that the more severe the past discrimination, the more time it takes to achieve the quota; in addition, an implementation ratio that is more favorable to non-blacks—*e.g.*, one black to one white promotion plan rather than two blacks to one white—necessarily results in a longer duration.

**7.** If the duration of the decree should appreciably extend beyond the period now contemplated, any party may of course seek modification of the decree. *See United States v. Armour & Co.*, 402 U.S. 673, 674–75, 91 S.Ct. 1752, 1754, 29 L.Ed.2d 256 (1971).

standards and procedures. It governs virtually every phase of an officer's employment by the New Orleans Police Department. The black officers, through able counsel, have devised a complete overhaul of the police operation to insure the eradication of discrimination against black persons. The city agrees and so does the court. An Academy Review Panel, at least half of its members black, will oversee training and report directly to the Superintendent of Police. Forty-four black officers are to be promoted immediately to supervisory positions.

The district judge made one objection. After long and careful consideration (his months matching our few days), he decided that it was unreasonable and unnecessary to require one black for one non-black promotion for the next 12 years or longer. He thought color-blind merit selection, after the other corrections are made, would be better for all affected persons, who otherwise—for the most part—would be seriously hampered and discouraged by the prospects for promotion. Looking at the whole plan and at the evidence before the court, I must concede that the decision was within that court's discretion, and I would affirm it.

## ON SUGGESTIONS FOR REHEARING EN BANC

Before CLARK, Chief Judge, BROWN, WISDOM, GEE, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.

BY THE COURT:

A member of the court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by the court en banc with oral argument on a date hereafter to be fixed. The clerk will specify a briefing schedule for the filing of supplemental briefs.

IT IS FURTHER ORDERED that the mandate previously issued is recalled. See Fifth Circuit Local Rule 17.